RAGLAND v. NORFOLK & WASHINGTON (D. C.) STEAMBOAT CO.

(District Court, E. D. Virginia. July 22, 1908.)

1. SHIPPING — CARRIAGE OF PASSENGERS—AUTHORITY OF MASTER—DELEGATION —ARREST.

The authority of the master of a vessel carrying passengers to arrest them cannot be delegated to minor officials or others on board, but, as far as is reasonably possible, must be exercised personally, at least to the extent of giving directions therefor.

2. SAME.

If the authority of the master of a vessel to arrest a passenger may be delegated at all, it must be to a person of experience and known to possess character, intelligence, judgment, and tact, and the authority so delegated should not be exercised without the master being called on to determine the necessity therefor, unless the ship or other passengers are endangered.

3. SAME—IMPRISONMENT OF PASSENGER.

Where a passenger on a steamship was arrested by a watchman, without justification, dragged down the saloon stairway by the collar, pushed

inside the freight room, and kept there in custody of another watchman for an hour, the shipowners are liable in admiralty as for a false arrest and imprisonment.

4. SAME—DAMAGES.

A passenger on a steamboat was arrested, without justification, by a watchman at night, dragged to the lower deck by the collar, and placed inside the freight room provided for second class passengers in charge of another watchman for an hour. He was greatly humiliated, but no serious harm was done him further than the indignity and inconvenience imposed for the time being. *Held*, that libelant was entitled to damages in the sum of $1,000.

## In Admiralty.

This is a libel in personam to recover damages for the false arrest and imprisonment of the libelant on board the steamer Norfolk, of the Norfolk and Washington (D. C.) Steamboat Company, on the night of the 25th of September, 1907. On the day named, the libelant, being in New York, bought a ticket over the Pennsylvania Railroad via Washington by the respondent's steamer to Norfolk. He left New York about 11 o'clock in the forenoon, and arrived at Washington about 5 o'clock in the afternoon, and at once proceeded to the steamer. Shortly after arriving on board, he saw the purser of the vessel, and asked him for a stateroom, and was told to come back at 9 o'clock that night, by which time the purser expected to have ascertained whether any passengers who had previously reserved accommodations, had failed to take the boat, and might thus be able to give libelant a stateroom. The evidence does not show that libelant returned to the purser's office as requested, but it is a fact that he did not get a stateroom. At this period of the year, and owing to the large crowds who were traveling by this steamship line to the Jamestown Exposition, the boat could not provide staterooms for all passengers; only those booking in advance procuring same. To meet the situation, and afford as much convenience to travelers as possible, the steamship company provided cots or mattresses, which were laid on the floor of the saloon; the forward portion of the saloon being set apart for men, and the after part for women. Some time about 10 o'clock at night, when the stewards came around to place the mattresses in position for use by passengers, the libelant was seated on a settee, having his suitcase with him. The person in charge of the mattresses asked him to move, but libelant refused, alleging that he was a first-class passenger, and entitled to a seat. The officer then went on to other parts of the saloon to see that the mattresses were properly arranged. Shortly thereafter, a second watchman, also on duty and engaged in the same business, approached the libelant from the end of the ship opposite from where the first watchman had come, and, finding libelant at the settee and his baggage on the floor, ordered him to move same, and himself also, as the space occupied by libelant and his suitcase was required to place a mattress there. Libelant, at the time the second officer approached, was talking to another passenger named Johnson, and some words passed between them as to the dirty condition of a mattress, which were overheard by the second watchman, who thereupon took exception to libelant's remarks, and, in the presence of a large crowd of passengers, cursed and abused him, causing him to be greatly humiliated, and caught him by the collar and dragged him to the stairway leading to the lower deck, and down the steps, finally taking libelant to the freight room door, when he pushed him inside the freight room, the place provided for second-class passengers, and directed another watchman there to keep libelant in there until he (the second watchman) let him go upstairs, or he promised to behave himself. Libelant, upon being thus put under arrest, demanded to see the captain, or some officer superior in authority to this watchman by whom he had been placed under arrest, which request was denied, on the ground that the captain was asleep, which the evidence shows was not the case. Libelant was confined on this freight deck under arrest and guard for about an hour, and then allowed to return to the saloon deck, where he resumed and kept the seat formerly occupied by him for the

remainder of the night, and until he left the vessel next morning in Nor-folk.

The respondent charged: That libelant was boisterous in his conduct, and profane in his language, and refused to obey the orders of the officers of the ship, and for these reasons he was removed to the freight deck; that he was treated gently, with no more force than was absolutely necessary; that libelant was not cursed or threatened in any manner; and that his removal from the saloon was justifiable under the circumstances.

The controverted facts in this case are very few. There is considerable dispute as to whether Ragland was sitting down or standing up at the time the alteration which brought about this arrest took place, but that is not very material. The fact is that he was sitting down when he had the talk with Thompson, the first watchman, and, when Wilson came around later, he was standing up.

Thorp & Bowden, for libelant.

Loyall, Taylor & White, for respondent.

WADDILL, District Judge (after stating the facts as above). This is the case of a passenger placed under arrest. The preponderance of evidence establishes the truthfulness of libelant's version as to what occurred and the manner of his treatment. His witnesses were passengers, traveling salesmen, evidently persons of character and intelligence, entirely disinterested, who did not know libelant, nor he them. They resided in three different states, Louisiana, Mississippi, and Tennessee, and agree that the arrest and treatment of the libelant was outrageous, uncalled for, and neither justified or necessitated by anything libelant said or did. According to respondent's witness Wilson's own account of the transaction, there was no excuse or necessity for what was done. Officers of steamboats and passenger vessels should be exceedingly careful before putting a passenger under arrest. They are the servants of the passengers on their boats, paid for the purpose of treating them kindly. The trouble on this occasion largely arose from a misapprehension on the part of the captain of the steamer of his power and duty as master of the ship. The master of a passenger steamer is an exceedingly important officer. He should be of exceptional firmness, intelligence, and character, and more than ordinarily endowed with common sense and tact, and always gentle and courteous. He has vast powers in dealing with passengers in situations that are liable to and do arise on his vessel, and he may in a proper case, and after exhausting pacific measures, place a passenger under arrest; but to suppose, as he testified he did, that he could delegate this authority to minor officials or others on board, cannot be sanctioned. When the time comes to arrest passengers, an occurrence on a steamboat only second in importance to navigating the vessel in safety, it is his duty to properly care for and protect them, as far as is reasonably possible, and personally to exercise the responsible duties at hand, and at least to give personal direction to what is being done.

In the case of Chamberlain et al. v. Chandler, Fed. Cas. No. 2,575, Story, Circuit Judge, states the master's authority on a vessel as follows:

"The authority of a master at sea is necessarily summary, and often absolute. For the time he exercises the right of sovereign control, and obedience

to his will and even to his caprices becomes almost indispensable. If he chooses to perform his duties, or to exert his office in a harsh, intemperate, or oppressive manner, he can seldom be resisted by physical or moral force, and therefore in a limited sense he may be said to hold the lives and personal welfare of all on board in a great measure under his arbitrary discretion. He is nevertheless responsible to the law, and, if he is guilty of gross abuse and oppression, I hope it will never be found that courts of justice are slow in visiting him, in the shape of damages, with an appropriate punishment. In respect to passengers, the case of the master is one of peculiar responsibility and delicacy. Their contract with him is not for mere ship room and personal existence on board, but for reasonable food, comforts, necessities, and kindness. It is a stipulation not for toleration merely, but for respectful treatment, for that decency of demeanor which constitute the charm of social life, for that attention which mitigates evils without reluctance, and that promptitude which administers aid to distress. * * * It gives compensation for mental sufferings occasioned by acts of wanton injustice, equally whether they operate by way of direct or of consequential injuries."

Hughes on Admiralty, § 102, page 187, says:

"Any improper treatment of a passenger by any of the crew inflicted within the line of his duty is the subject of an action."

The Supreme Court of the United States, in The City of Panama, 101 U. S. 462, 25 L. Ed. 1061, also says:

"Owners of vessels engaged in carrying passengers assume obligations somewhat different from those whose vessels are employed as common carriers of merchandise."

Speaking of the power and duty of the master as to passengers on his ship, it is stated, in Parsons on Shipping & Admiralty, p. 636, that the captain must be, from the necessities of his employment, clothed with almost despotic authority over all on board his ship. The power of the master need not be, and therefore is not, so great in the case of passengers as over the crew. And the same writer, on pages 624, 625, says:

"The common carrier by water is always regarded as under a contract to supply his passengers with comfortable accommodations by day and by night."

This power of arrest is a very serious one, and on the occasion in question was delegated to watchmen, one of whom had been a street car conductor for the best part of his life, and on the ship two or three years, but who was more circumspect and of better temperament than the other, who was formerly a structural iron worker, and had only been on board 30 days, and exercised his authority with unnecessary harshness, without considering the rights of the passenger. One who is given authority to arrest passengers, if such authority can or should be delegated at all, ought to be a person at least of experience, and known to possess character, intelligence, good judgment, common sense, and tact, and arrests ought never to be made, unless the ship, or other passengers, are endangered, without the captain being called upon to determine the necessity therefor. The court cannot conceive of a ship's master who could not have smoothed down the situation as it was on this occasion, with a little judicious management, without having to make an arrest. All that was required was common sense and a little diplomacy on the part of those in charge of the ship.

In 1 Joyce on Damages, § 452, citing Kolzem v. Broadway, etc., Ry. Co., 1 Misc. Rep. 148, 20 N. Y. Supp. 700, and Pearce v. Needham, 37 Ill. App. 90, it is said:

"Where an arrest is made under circumstances indicating a wanton disregard of the rights of the persons arrested, punitive damages may be awarded, though there is no actual malice."

The right of recovery here is clear. The officers who testified for the steamer, with the exception of Mr. Wilson, knew very little of the occurrence. The purser and Mr. Ragland differ as to what took place between them. Against Wilson's statement are four or five passengers, who testify clearly and positively that the treatment accorded the libelant was without justification.

The only matter left to pass upon is the question of damages, which in this case, on account of the unprovoked, cruel and unnecessary conduct of the watchman, ought to be for a substantial amount, which the court finds to be the sum of $1,000. It is rather a novel experience to the court to have to assess damages in a case of false arrest. The libelant clearly established his case, and the circumstances of his arrest were aggravated. There was no serious harm done him, further than the indignity and the inconvenience imposed for the time being, which was not very long. Under all the circumstances, the allowance indicated is proper. He is entitled to damages for the humiliation and indignity put upon him, and the court should be influenced by the circumstances of the case. In other words, there was no necessity for what was done, nor would it have occurred if an officer had been in charge of the boat who had the slightest tact. It arose because the master delegated his authority to a watchman, who had an idea that he could do whatever he pleased under such delegation. The sum allowed is not to pay libelant for what he lost. He was a passenger, entitled to good treatment. His time could not be valued. There is no dispute about the facts. Five disinterested passengers all testified to the occurrence; one of them going so far as to say that, if he had been approached in the manner libelant was by the watchman, and he had had a pistol, he would have killed him.

A decree may be entered for the sum named, with costs.